

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-25-00438-CV

———————————————————

IN THE INTEREST OF K.N., M.N., AND M.N., CHILDREN

On Appeal from the 367th District Court
Denton County, Texas
Trial Court No. 23-11236-158

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Appellants M.N. (Father) and H.N. (Mother) have appealed the trial court's order terminating their parental rights to their three children, to whom we will refer in this opinion as Kelly, Maci, and Mandy.[1]  Father's appointed appellate counsel filed an *Anders* brief stating that the appeal is frivolous and wholly without merit.  *See Anders v. California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 1400 (1967); *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, order) (holding that *Anders* procedures apply in cases terminating parental rights).  Mother's appointed appellate counsel filed a merits brief raising four appellate issues—three challenging the sufficiency of the evidence to support the trial court's endangerment and best-interest findings and one complaining that the trial court denied Mother due process by allowing the trial to proceed despite a missing witness.  We will affirm the trial court's judgment.

## I.  BACKGROUND

### A.  THE CHILDREN'S REMOVAL

Father's and Mother's history with Child Protective Services (CPS)[2] dates back to 2015.  The present case, though, began with a CPS intake in 2023.  In July 2023, police were called out to Cedar Hill State Park, where Mother was allegedly "trying to

---

[1]To protect the children's identities, we refer to them and their relatives by aliases.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]CPS is a subdivision of the Texas Department of Family and Protective Services.  *See In re N.L.*, No. 02-25-00205-CV, 2025 WL 3008022, at *10 n.20 (Tex. App.—Fort Worth Oct. 27, 2025, no pet.) (mem. op.).

bite relatives." Father was not present for the incident but came from Denton to pick up the children. Mother was arrested for public intoxication.

There were more CPS intakes involving the family in August 2023, including "a concern for the parents being drunk and driving with the children" and a separate incident the following week in which CPS was called because "there was a lot of arguing amongst all the family members" while the children were in the home. Then, one night in mid-August, CPS received an intake report from a 911 call that Mother had locked Kelly—then eleven years old and the oldest of the children—out of their home.

The family was referred to the Department's family-based safety services (FBSS)[3] on September 8, 2023. Niaah Hutchison, an FBSS caseworker, tried to assess the home where Mother and the children lived with Mother's parents. According to Hutchison, roaches were falling from the home's ceiling, and the home had "trash, piles of dirty clothes, dirty mattresses on the floor, dishes everywhere," and animal feces outside. Also, "the floor was sinking in and wet, with a foul odor."

As part of the family's FBSS safety plan, Mother and Father were not to be together—unsupervised—with the children. While participating in FBSS services,

[3]The Department provides family-based safety services when a child is "at risk of abuse or neglect but is not in the Department's conservatorship. The Department provides these services to protect the child from abuse and neglect, to help the family reduce the risk of future abuse or neglect, and to prevent the child's removal from the family's home." *In re J.M.*, No. 02-21-00346-CV, 2022 WL 872542, at *1 n.3 (Tex. App.—Fort Worth Mar. 24, 2022, no pet.) (mem. op.).

3

Mother got into a physical fight with Kelly, and Maci called 911 because she thought that Kelly was dead. Then, on December 6, 2023, the Department received a report stating that law enforcement had been called to a restaurant the day before because Father "was assaulting [M]other [while] the children were present" and Mother was intoxicated. Father was arrested for continuous violence against the family, and an emergency protective order was issued, prohibiting him from contacting Mother or the children.

Department investigator Scott Lang interviewed Father, Mother, Kelly, and Maci. Father and Mother each blamed the other for instigating the physical altercation, but both parents denied assaulting the other. Both parents also confirmed that during the incident, the children were in the back seat of the car and crying. Father told Lang that Mother had smelled like alcohol that day, but Mother told Lang that she had not been drinking.

On December 8, 2023,[4] the Department filed suit seeking temporary managing conservatorship of the children and termination of Mother's and Father's parental rights.[5] The trial court issued an emergency order, and the children were removed from Mother's possession and placed with Father's parents. According to the

---

[4]The trial court granted one six-month extension of the initial December 9, 2024 dismissal date. *See* Tex. Fam. Code Ann. § 263.401(a), (b).

[5]At this time, Kelly was twelve years old, Maci was nine years old, and Mandy was three years old.

Department's service plan, Mother was not allowed unsupervised visitation with the children, partly because of her having hit Kelly.

## B. PRETRIAL HEARING

In March 2025, Mother filed a Motion to Return and Monitor (MRM), asking that the children be returned to her but that the Department continue to serve as the children's temporary managing conservator and monitor their placement "to ensure the children [were] in a safe environment." The trial court heard the MRM in May 2025, less than a month before trial. Mother called two witnesses at the hearing: herself and Jennifer Hutchison,[6] who had been the caseworker since April 2024. The Department called one additional witness: Robert C de Baca[7] of Court Appointed Special Advocates (CASA)[8] of Denton County. These witnesses testified generally regarding Mother's progress and work on her service plan and the children's

---

[6]At the MRM hearing and at trial, the trial court and multiple attorneys referred to this witness as "Hutchinson." However, during the MRM hearing, she identified herself as "Jennifer Hutchison," and her name is spelled likewise in the clerk's record. We will refer to this caseworker by her first name to avoid confusing her with witness Niaah Hutchison.

[7]This is how the witness spelled his name on the report he filed with the trial court. Because the Department addressed him in the trial court as "Mr. C de Baca," we construe his surname as "C de Baca" and so refer to him in this opinion.

[8]Court Appointed Special Advocates (CASA) consists of county, state, and federal associations comprised of individuals who advocate for effective public policy for children in the child-protection system. *In re J.G.*, No. 02-20-00038-CV, 2020 WL 3410503, at *4 n.7 (Tex. App.—Fort Worth May 28, 2020, no pet.) (mem. op.).

behaviors and needs while in the Department's care. At the conclusion of the hearing, the trial court denied Mother's MRM.

## C. TRIAL AND RULING[9]

The Department's first three witnesses at trial were police officers. Officer Arun Koshy of the Lewisville Police Department had responded to the December 6, 2023 disturbance. He testified that Mother had "seemed very nervous and scared" and that he had noticed "fresh" bruising on her left arm. He testified that she "originally kind of was denying any kind of physical altercation, but then she later admitted that she got backhanded by her husband. And then she got grabbed on -- by the left arm, so that's what caused the bruise on her left tricep." He further testified that he had picked up a scent of alcohol from Mother when he was speaking with her.

Officer Koshy said that he then spoke with Father, who "essentially said that it was just a verbal argument and that nothing real [had] happened." But after Officer Koshy confronted Father with what Mother had said, Father "said he was the one that got hit in the back of the head." Officer Koshy relayed that Father had called Mother "crazy" and said that she was "all over the place" mentally. Officer Koshy

---

[9]The four-day trial took place over three consecutive days in June 2025; after a two-month recess, it resumed and concluded on August 19, 2025. The trial court signed its Order of Termination on August 26, 2025. *See* Tex. Fam. Code Ann. § 263.4011(a). We limit our summary of the facts developed at trial to those necessary to inform our analysis of "every issue raised and necessary to final disposition of the appeal." *See* Tex. R. App. P. 47.1.

6

arrested Father for continuous family violence. Certified court documents showing that Father later pleaded guilty to assault causing bodily injury were admitted into evidence without objection.

Officer Kyle Gray of the Denton Police Department testified that he "was dispatched to a disturbance call" on December 23, 2023. Mother was with another man at his apartment, and Father had been sending her threatening text messages, including "a screenshot of a map that showed her pin, her location, to indicate that he was able to track her location or see where she was." Mother reported to Officer Gray that she and the man she was with had awoken that morning "to the sound of screaming and yelling from outside the apartment . . . , which she believed to be [from Father]." Father was not there when Officer Gray arrived, but Mother showed Officer Gray the texts that Father had sent her. Father was charged with violation of a protective order. Court documents showing that he pleaded guilty to that charge and received a probated sentence were admitted into evidence without objection.

Officer Travis Nicholas of the Denton Police Department testified that he had arrested Mother for driving while intoxicated (DWI) following a car accident in August 2023. While questioning Mother, Officer Nicholas noticed that "she had bruises and . . . a black eye," and she made vague references to domestic violence.

Officer Nicholas testified that he "offered medics, if she wanted medics to come check her out," but Mother declined. Court documents showing that Mother pleaded guilty to the DWI charge and was placed on probation were admitted into

evidence without objection. A redacted copy of Officer Nicholas's incident report was also admitted into evidence.

The Department then called Hutchison, who testified that when she initially visited Mother's home in early September 2023, it "was unlivable" and that the Department "couldn't even complete the . . . initial visit . . . due to the roaches falling from the ceiling." From what Hutchison saw, she did not think that the home could ever be fixed to be a safe place for children. According to Hutchison, Mother had "said she was not making enough to get stable housing for her and the children."

Mother confirmed that there had been "ongoing domestic violence" between her and Father, which Mother acknowledged had gone on in front of the children. Hutchison said that Mother also "admitted [that] her alcohol use was out of control" and stated that Kelly had "attacked her." Hutchison testified that a safety plan was put into place "[d]ue to the physical altercation between [Mother] and [Kelly] and also [Mother]'s excessive drinking of alcohol." Hutchison also testified that Mother had been arrested for public intoxication "[t]wo or three times" and that, on one occasion, the children were present.

Lang testified about his investigation into the December 2023 physical altercation between Mother and Father. He testified that Mother had stated that Father belittled her, called her names in front of the children, and took a swing at her. She had also reported "that he got physical and yanked her hair and pulled her arm." While testifying about Mother's and Father's criminal histories and the family's CPS

8

history, Lang responded, "Correct," when asked whether he recalled reports of one incident in which Father had "bec[o]me intoxicated . . . and [had] attempted to strike [Mother] but instead punched [Mandy]."

C de Baca testified that "CASA's position [was] in support of terminating parental rights." He testified that Mandy had recently turned four years old and was "doing really well" and "thriving" in her then-current placement. He also testified that Maci had "fairly recent[ly]" been placed in a foster home with Kelly and was also doing "[r]eally well." He averred that Maci, who was ten years old at the time, and Kelly, who was thirteen, were "heavily bonded." He also said that their current placement was adoption-motivated and was also interested in being a placement for Mandy as well if that was in the children's best interest. But C de Baca thought that it was in Mandy's best interest to remain in her then-current placement because it had been the best one "by far."

C de Baca was concerned about Mother's past alcohol usage and continuing relationship with Father.[10] He also expressed concerns based on what he had observed during Mother's visits with the children:

---

[10]C de Baca's exact testimony about Mother and Father's relationship was, "Another concern that I have is they are -- it appears that they're still seeing each other, so that kind of seems like not removing herself from the situation, especially with that being a big part of the reason for removal." He testified that he was concerned that Mother had testified at the MRM hearing that she planned to still maintain that relationship.

[Maci] seemed to be kind of ignored and left off in the corner, primarily using electronic devices to entertain her. [Mandy] got a lot of attention. There were tantrums being thrown if children didn't get what they wanted, specifically regarding -- typically it was like candy or an electronic device to play with.

[Kelly] was typically kind of the figure in the room that tried to maintain control over it. Being a child, it's not really -- it's not really appropriate, and just overall kind of -- it just didn't feel like -- it didn't feel like the kind of gathering you'd have if you hadn't seen your children in a week. There wasn't -- there w[ere] no group activities. There w[ere]n't any meaningful conversations. Just kind of felt like three people hanging out and nobody really had control of the situation.

He added that the children "would sometimes fight and [that] it was a little bit beyond roughhousing" in his opinion. According to C de Baca, one reason the children were separated to begin with was that Maci and Mandy were fighting a lot physically, which was a concern for Mandy's safety when they were placed together. He explained that the behaviors that the children had exhibited were one of the reasons that they had been in multiple different placements throughout this case but that they had recently "been improving." He testified that Maci had been released from psychiatric care since that hearing and was doing "[m]uch better" since her release. He understood that Maci and Kelly needed a higher level of care than Mandy.

C de Baca indicated that, the weekend before trial began, Kelly had expressed that she did not want to see Mother anymore. Ultimately, he believed that it was in the children's best interest that Mother's parental rights be terminated "[b]ecause none of [Mother's] behaviors ha[d] changed[, t]he reasons for removal ha[d]n't been

10

addressed," and even though her "services ha[d] been done for the most part," he had "witnessed no change in [her] behaviors[ or] in [her] interactions with the children."

The Department then called Mother as a witness. She acknowledged that the children had experienced "some trauma" while living with her and Father, but she denied a lot of the accusations against her and Father and claimed to not remember other events.

Mother acknowledged that the Department had found "reason to believe" that she had engaged in neglectful supervision."[11] In June 2015 but denied that she had left Kelly in a car while she was passed out in a breezeway. She admitted that "some stuff [had] happened" in Cedar Hill in July 2023 and that she had been charged with public intoxication as a result, but she deflected when asked about threatening to bite her relatives. She admitted getting another public-intoxication charge and a DWI that same year. When asked if she had a drinking problem, Mother answered, "I do not anymore. I'm -- I'm in recovery." When asked if she considered herself to be an alcoholic, she responded, "From my past, yes, but I'm in recovery. I have not had a drink." She later clarified that she had been sober from alcohol since October 2024.

---

[11]After investigating allegations of child abuse or neglect, CPS will assign one of five possible dispositions: (1) reason to believe (based on a preponderance of the evidence); (2) ruled out; (3) unable to complete; (4) unable to determine; or (5) administrative closure. *In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *6 n.7 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.).

Mother admitted that there was a lot of domestic violence in her home and that the children had "witnessed some of it." When asked about the altercation with Father at a restaurant in December 2023, Mother acknowledged that she had previously testified that there had been no physical altercation that day. When asked if she was lying then, Mother answered, "I made a mistake, so yes." She testified that in December 2023, she realized that she was a victim of domestic violence and that Father was her abuser. However, she also testified that there had been only one other incident in which Father had hit her. When asked if all of the CPS reports for domestic violence were lies, Mother responded, "Yeah, kind of, because some stuff was reported as -- it was false. And just like the incident with -- they said there was in the report of him being arrested for domestic violence when it wasn't true." She further testified that she had not filed for divorce or for a protective order against Father but would "if it [came] down to it . . . to protect [the] girls."

Mother said that Father was a good father. She testified that she had asked her prior caseworker for family counseling and that the caseworker had said that she would get back to Mother but never did. Mother also testified that her father had passed away in January 2025 and that Father had come to the funeral. Mother explained that she "could not tell him not to go to [her] dad's funeral, out of respect for him."

Mother described an "altercation" with Kelly in August 2023 but claimed that "[i]t wasn't a physical, like, altercation." She testified that she "was trying to calm

[Kelly] down" but denied slapping Kelly or locking her outside of the house. She also denied that Kelly had called 911.

Mother testified that in May 2025 she had submitted to a hair-strand test, believing "it was going to be negative." But it was positive.[12] She denied using drugs——specifically methamphetamine—or having been around people using methamphetamine and declared that the test result "was a false positive."

Mother conceded that exposing the children to domestic violence had created an unsafe environment for them, that allowing the children to be exposed to drugs created an unsafe environment for them, and that allowing the children to live in an unsanitary and unsafe home had created an unsafe environment for them. But she thought that they would "be happy again" to be back in her care. Mother believed that the children had suffered emotional harm in the care of the Department. She expressed concerns "with [Mandy's] being in a different home than the other girls and . . . [Maci's] . . . being put on all these medications six times a day." Still, Mother understood that the children had been in therapy since removal and that they had benefited from that therapy.

Mother also testified that she had completed an intensive outpatient program, a parenting class, and a treatment plan with Merit Family Services that involved

---

[12]Although the drug-test results had not yet been admitted at this point in the trial, they were later admitted over Mother's objection. The results indicated that Mother had tested positive for methamphetamine in May 2025.

13

individual therapy sessions. She explained that she had "not completed" the counseling component of her service plan because Jennifer had told her to continue doing it. But when asked if she had downplayed to her therapist the domestic violence that had been going on in her home, Mother testified that in her sessions they "didn't talk too much about the domestic violence." And Mother had difficulty articulating what she had learned in the domestic-violence class to prevent the children from witnessing the same situation again.

After Mother finished testifying, the Department called Lisa Grelle, the conservatorship supervisor assigned to this case. Grelle testified about several other CPS cases that the family had over the years; FBSS had provided services to the family in two of them. Grelle was already familiar with the family and had been their FBSS caseworker in a prior case.

Grelle testified that the June 2015 CPS intake that had received a "reason to believe" disposition was based on the "concern that the children [had been] exposed to drugs and . . . fighting in the home and . . . were not getting proper care." In April 2018, "there were concerns that . . . [Maci] was coming to school with improper footwear, and [Kelly and Maci] were coming to school smelling . . . like they hadn't showered." Like the 2015 case, that case was found "reason to believe."

In April 2021, "there were concerns with the children coming to school dirty and without proper footwear and . . . [there was] a report of a bruise on [Maci]'s cheek." That case received a disposition of "reason to believe for neglectful

14

supervision." The next intake, received in October 2021, "was for domestic violence allegations. It was reported that [Father] was at the emergency room with [Mandy]. She[13] had been struck by [Father], and [Mandy] had also been struck in . . . the altercation. And then it was . . . also reported that they violated a safety plan." Grelle explained that as part of a safety plan that she had put in place for that case, Mother and Father were not supposed to have any unsupervised contact with their children. Grelle had also explained the purpose of the safety plan to Mother and Father: that the Department was "looking for behavioral changes in order to keep their children safe."

Grelle testified that in 2022, she visited Mother at her parents' home. Grelle remembered at that time "discussing a hole in . . . between the kitchen and living room that needed to be repaired. They had it covered with heavy objects to keep [Mandy] away from it. At that time [Mandy] was [in] the home. "

Grelle testified about the family's multiple CPS cases in July, August, and September 2023:

> [On] August 4th there was a concern for the parents being drunk and driving with the children. There w[ere] still continued concerns for the state of the home. There was a report that [Maci] had asked to live with a friend because she wanted a normal family. The home still had foul odors. And there was a report of a police call-out due to yelling. And then it was also reported that [Mother] had a black eye.

---

[13]In the context of the record and the trial court's fact finding number 27, it appears that the "[s]he" Grelle was referring to is Mother.

When asked what services Mother had not completed, Grelle testified that she had not been discharged successfully from individual counseling. A redacted version of Mother's psychological records was admitted into evidence.

When Grelle testified that she had concerns that Mother had not been forthright in her discussions with the psychologist, Mother's attorney asked to take Grelle on voir dire, which the trial court allowed. On voir dire, Grelle stated that she was basing her testimony "on the case record," which had been prepared by Jennifer, whom Grelle had supervised and who had been the caseworker for most of the case. When asked if Jennifer had been fired, Grelle responded, "She was involuntarily dismissed," and stated that Jennifer "no longer work[ed] for OCOK."[14] Mother's attorney then objected to "th[e] whole line of questioning"—"if . . . we're going to work off what Jennifer . . . said"—as "a violation of the constitutional right to confrontation." The trial court recessed the proceedings for the day without ruling.

The following day, after a lengthy discussion with the parties' attorneys, the trial court ordered the Department to subpoena Jennifer to testify at trial. Father then took the witness stand and testified about his criminal history. He equivocated on whether or not he was still in a romantic relationship with Mother. He admitted that

---

[14]OCOK (Our Community Our Kids) is one of the contractors that now provides conservatorship services on the Department's behalf, and an OCOK permanency specialist is the equivalent of a CPS caseworker. *In re K.J.*, No. 02-23-00198-CV, 2023 WL 6475930, at *5 n.10 (Tex. App.—Fort Worth Oct. 5, 2023, pet. denied) (mem. op.).

he had told the initial investigator from CPS that his relationship with Mother was toxic but testified that he was still planning to continue his relationship with Mother if they could "ever do marriage counseling and get this taken care of." He said that the children "need[ed] their mother." But he also believed that Mother's behaviors leading up to and during December 2023 were harmful to the children and had created an immediate risk of harm to them. And Father testified that although Mother had been able to remain sober in the past, there had been multiple situations in which Mother's drinking had put the children in danger. Father denied having had any responsibility in the domestic-violence incidents with Mother. He believed that his absence from the children's lives had hurt them, and he blamed that absence on Mother's lying about him.

But Father also testified positively about Mother's recent improvements. He thought that the children would be safe with Mother. Father explained that Mother's father was problematic at times, that his passing was something that had changed the dynamics of her household, and that he thought that she would be better equipped to have the children in the home. He admitted attending Mother's father's funeral "to show [his] respects for [her] father."

Father admitted using drugs, including methamphetamine, and to skipping court-ordered drug tests. He stated that his actions "ha[d] harmed [his] children tremendously." He also testified that he had never seen Mother use methamphetamine or anyone else give her methamphetamine.

17

On the fourth and final day of trial, the Department told the trial court that it had unsuccessfully attempted to subpoena Jennifer and that its investigator had "ma[d]e contact with her briefly" but that she had "said she was not in the area[ and] would not give a location." Mother objected "to anybody testifying about anything that [Jennifer] put in the file." The trial court at first appeared to grant Mother a running objection "to anybody testifying about anything that [Jennifer] put in the file," specifically "the witness that they have from the Department who has no personal knowledge about what happened." However, the trial court then stated, "I mean that'll be noted, the objection. I'll address it. How I'm going to -- how I'm going to rule on that objection, I will note at that point." Thus, the trial court did not definitively rule at that time.

Kennetta Harrison, a permanency specialist for the Department, testified that she was the family's current caseworker at the time of trial. She described a visit she had observed between Mother and the children as "a little chaotic." She said that Mother "wasn't able to control [Mandy, who] was actually hitting her sisters."

Harrison had also been out to Mother's residence, which was the same one from which the children had been removed. Harrison testified that the floors were "slick and sticky" and "seemed very unsteady." She had safety concerns. According to Harrison, Mother said that Kelly and Maci would sleep on couches in the living room and that Mandy would be sleeping in the Mother's bedroom in a twin bed.

Based on what Harrison observed, the home did not have enough space for the children's clothing.

Harrison found Mandy's placement to be a safe and stable environment and testified that all her needs were being met in that placement. She also testified that Kelly and Maci's placement had been able to address their needs. On cross-examination, Harrison testified that there was not a plan for all three children to be adopted by the same placement.

Grelle retook the stand and testified that it was in the best interests of all three children that Mother's and Father's parental rights be terminated, citing "continued drug use," domestic violence, and "emotional trauma." She testified that each child was in a stable placement with their needs met, which had not been happening when the children were with their parents.

Grelle testified that in the year and a half between removal and trial, she had not seen Mother or Father take any accountability that would indicate that they had learned from the process. She said that they were "not . . . creating a safe environment for the kids to come home to." When asked if she had any new concerns since her last testimony, she answered, "No new concerns, just that there's not been -- that they've had CPS involvement for ten years, and there's not been behavioral changes." Grelle also testified that she had personally talked to Mother and asked her how she was going to keep her kids safe from Father. Grelle relayed

19

that Mother had asked her "what she was supposed to do" because they were married and had been together for a long time."

Grelle testified if the parents' rights were terminated, OCOK intended to have the children adopted and would continue to make sure that the children got to see each other on a regular basis.

The Department then recalled C de Baca, who testified that he still believed it was in the best interest of the children that Mother's and Father's parental rights be terminated. He stated that the concerns that CASA had when he testified back in June—"proximity to domestic violence, alleged and understood drug use, and . . . alcohol"—had not been addressed and that, "[i]f anything, they[ had] been inflamed." He testified that Kelly and Macy's new placement was "fantastic" and offered the following update:

> [Maci] is still exhibiting some symptoms consistent with trauma. However, they've been reduced as time goes on. She's becoming very well-adjusted.
>
> [Kelly] is ahead of her as far as adjusting to the new living situation.
>
> Both of them seem happy, healthy. All of their needs have been met and some. And the -- the placement seems well-equipped to handle the needs of these children.

C de Baca also testified that Mandy was "getting better every day." He believed that it was in the children's best interests to remain in their respective placements.

Mother called one witness: Dr. Melissa Giguere, a forensic toxicologist who examined Mother's May 2025 drug-test results. Dr. Giguere explained that "anything you ingest and you metabolize . . . will go into your . . . keratin, and it will show up in your nails and . . . your hair." Because Mother's nails had tested positive for methamphetamine but not amphetamines, Dr. Giguere opined that the results were more indicative of "an exposure versus an ingestion." She explained that "if the body were to metabolize methamphetamine, you would get amphetamine." She testified that she would never expect to see methamphetamine without the metabolite amphetamine if methamphetamine had been ingested. She added, "Besides exposure, if there's been no exposure, it could potentially be something at the collection site that is contaminating the samples when they're being collected."

The attorney ad litem then recalled Grelle, who had heard Dr. Giguere's testimony. Grelle testified that the possibility that Mother had merely been exposed to methamphetamine but not smoked or ingested it herself was still "very concerning" to OCOK "[b]ecause that means she would [have been] around people that [were] using drugs, and that would still be a safety concern for her having her children." When questioned by the Department, Grelle confirmed that Father's drug of choice was methamphetamine and that both parents had stated that his drug usage was an issue. Grelle further testified that nothing that she had heard Dr. Giguere testify to changed her concern for the children if they were to be returned to Mother "because she[ was] around it apparently, . . . which . . . put[ the] children in danger."

21

## D. Trial Court's Ruling

The trial court found by clear and convincing evidence that termination of each parents' relationship with the children was in the children's best interest and that both parents had

> knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the children, pursuant to § 161.001(b)(1)(D), Texas Family Code; [and]
>
> . . . engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child[ren], pursuant to § 161.001(b)(1)(E), Texas Family Code.

*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). The trial court entered a judgment terminating Mother's and Father's parent–child relationships with the children.

After signing the judgment, the trial court issued extensive findings of fact and conclusions of law. In them, the trial court specifically found "the testimony of the officers, [D]epartment workers, . . . OC[]OK workers, CASA advocate, and other professionals to be credible." And it found Mother's and Father's testimony "to not be credible."

Both Father and Mother timely appealed.[15]

---

[15]Father and Mother each filed a notice of appeal, but Mother also filed a motion for new trial, which the trial court denied.

## II.  FATHER'S APPEAL

As we indicated at the outset of this opinion, Father's appellate attorney filed an *Anders* brief and accompanying motion to withdraw.  The brief meets the *Anders* requirements by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal.  Further, Father's counsel (1) provided Father with a copy of the *Anders* brief, (2) informed Father of his rights to file a pro se response and to seek further discretionary review from the Texas Supreme Court, (3) advised Father of his right to access the appellate record, and (4) took concrete measures to initiate and facilitate Father's right to review the appellate record.  *See Kelly v. State*, 436 S.W.3d 313, 319–20 (Tex. Crim. App. 2014).  Father did not file a response, and the Department declined to file a brief.

When an *Anders* brief is filed, we must independently examine the record to determine if any arguable grounds for appeal exist.  *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pets. denied).  Our examination should consider the record, the briefs, and any pro se response.  *In re L.B.*, No. 02-19-00407-CV, 2020 WL 1809505, at *1 (Tex. App.—Fort Worth Apr. 9, 2020, no pet.) (mem. op.).

After careful review of the *Anders* brief and entire record, we agree with Father's counsel that there are no arguable grounds for appeal in this case.

## III.  MOTHER'S APPEAL

Mother argues that the trial court erred by terminating her parent–child relationships with the children because the evidence was legally and factually

23

insufficient to support the trial court's endangerment and best-interest findings under Texas Family Code Section 161.001(b). We first set forth the applicable law and standards of review and then address the issues that are necessary to final disposition of Mother's appeal. *See* Tex. R. App. P. 47.1.

## A. APPLICABLE LAW

When the Department files a suit seeking termination of the parent–child relationship for more than one parent of the child, the trial court "may order termination of the parent–child relationship for the parent only if the court finds by clear and convincing evidence grounds for the termination of the parent–child relationship for that parent." Tex. Fam. Code Ann. § 161.206(a-1). The Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545. Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

24

## B. STANDARDS OF REVIEW

### 1. Legal Sufficiency

To determine whether the evidence is legally sufficient in parental-rights-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *J.F.C.*, 96 S.W.3d at 266. That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

### 2. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide

whether a factfinder could reasonably form a firm conviction or belief that the Department proved the grounds for termination. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## C. MOTHER'S FIRST AND SECOND ISSUES: ENDANGERMENT FINDINGS

In her first and second issues, Mother challenges the trial court's endangerment findings under Subsections (D) and (E), contending that the evidence is legally and factually insufficient to prove that she (1) knowingly placed or knowingly allowed the children to remain in conditions, or (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct, that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

### 1. Case Law on Subsection (D) and (E) Endangerment Grounds

When a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019). *Id.*

Under Subsection (D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "'[E]ndanger' means to expose to

loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

The conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *J.T.G.*, 121 S.W.3d at 125. Criminal activity that exposes the parent to incarceration may also endanger a child. *In re I.L.*, No. 02-18-00206-CV, 2018 WL 5668813, at *5 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.); *In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.). And a parent's substance abuse that affects his or her ability to parent can be endangering. *J.T.G.*, 121 S.W.3d at 125; *In re C.L.*, No. 2-09-126-CV, 2009 WL 3078588, at *4 (Tex. App.—Fort Worth Sept. 24, 2009, no pet.) (mem. op.) (per curiam).

Given the nature of environment-based endangerment, it logically follows that the relevant timeframe for an environment-based endangerment finding under Subsection (D) is prior to the child's removal. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *9 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied).

## 2. Analysis

Regarding the trial court's endangerment finding under Subsection (D), Mother contends that "although there had been previous allegations and abuse suspected by CPS, during the pendency of the current case, Mother has completed the requirements in her Family Service Plan and continue[d] to attend individual therapy." Specifically, Mother contends that "the Department cannot rely on testimony

surrounding the state of Mother's home, or whether Father was around Mother, at any time when the children were in the care of the Department" and that she "never knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed their] physical or emotional well-being." This latter claim is belied by the evidence, and as we explain below, the former is irrelevant.

Despite repeated intervention by the Department, Mother continued to allow the children to be exposed to endangering conditions. First, as Grelle testified, Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being "[b]y continuing to have them around domestic violence situations and drug use." The children had witnessed at least some of the domestic violence, and Mandy had even been hit during one of the incidents. In addition to Father's drug use, the children had also been exposed to Mother's alcohol abuse and related arrests. And in September 2023, months before the children were removed from Mother's care, they were living in a home with conditions so deplorable as to be deemed unlivable. This is legally sufficient evidence supporting the trial court's endangerment finding under Subsection (D). *See In re Z.R.*, No. 02-25-00268-CV, 2025 WL 3181160, at *8 (Tex. App.—Fort Worth Nov. 13, 2025, no pet.) (mem. op.) ("Evidence that a parent left her child in the care of a known drug user supports an endangerment finding under Subsection (D).") *In re H.N.H.*, No. 02-11-00141-CV, 2012 WL 117861, at *24 (Tex. App.—Fort Worth Jan. 12, 2012, no pet.) (mem. op.) (stating that evidence that

28

mother chose homes for her family to live in that had roaches, flies, terrible odors, broken windows that made heating difficult, and rotten food in the kitchen constituted "some evidence that [she had] knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being") (mem. op); *In re M.M.,* No. 2–08–275–CV, 2009 WL 2196129, at *8 (Tex. App.—Fort Worth July 23, 2009, no pet.) (mem. op.) (holding evidence of father's knowledge of mother's drug use, among other conditions, was legally and factually sufficient to support finding under Subsection (D)); *In re A.O.,* 2–09–005–CV, 2009 WL 1815780, at *5 (Tex. App.—Fort Worth June 25, 2009, no pet.) (mem. op.) (holding father's knowledge of mother's use of drugs and failure to take steps to protect the child from such endangering environment was sufficient to support finding under Subsection (D)); *In re M.R.,* 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposing a child to domestic violence supports an endangerment finding); *In re K.M.B.,* 91 S.W.3d 18, 24–25 (Tex. App.—Fort Worth 2002, no pet.) (holding that evidence that mother had exposed children to homes with roaches, animal feces, terrible odors, and general filth supported environmental endangerment finding).

Mother notes that her visits with the children had to be supervised while Father was still given unsupervised access to the children—even though (1) "Father had multiple arrests and allegations of domestic violence towards Mother, in which Mother and the children were victims," and (2) Jennifer had referred Father to a

batterer intervention course. She thus contends that because the Department had "deemed Father to not pose a danger to the children," she "could not have harmed the children nor allowed the children to be in a dangerous environment by allowing [them] to be in Father's presence" or "by continuing to live with Father prior to the removal of the children." We reject this contention for two reasons.

First, Mother does not confine her analysis to the period of time prior to the children's removal, which is the relevant timeframe for an environment-based endangerment finding under Subsection (D). *See A.O.*, 2022 WL 1257384, at *9.[16] Second, Mother herself testified at trial that she believed that exposing the children to domestic violence, allowing them to be exposed to drugs, and allowing them to live in an unsanitary and unsafe home created an unsafe environment for them.

The remainder of Mother's argument on this issue focuses heavily on her post-removal conduct. Mother contends that she

- had "completed the requirements in her Family Service Plan and continue[d] to attend individual therapy";

- had "addressed the concerns of domestic violence by not living with Father, and thereby not exposing the children to any further possible domestic violence incidents";

---

[16]Mother appears to be arguing that because the family was receiving services through FBSS at that time, she bore no responsibility for the children's physical or emotional well-being. She provides no authority for that argument, and we reject it.

30

- was not using drugs, was "in recovery for alcohol abuse, [and] ha[d] been sober during the pendency of this case"; and

- had "distanced herself from living with and being around Father," while acknowledging a couple "isolated incidents" in which she was around Father after the children's removal.

Even if credited in Mother's favor, this evidence of her post-removal conduct does not dissipate the evidence we have recounted of the endangering environment that the children were in pre-removal. *See In re J.W.*, 645 S.W.3d 726, 749 n.12 (Tex. 2022) (refusing to "foreclose the possibility that Subsection (D) could apply post-removal depending on the facts" but noting that, "typically, a parent whose child has been removed and who has only supervised visitation has no control over the child's environment, and the parent's conduct during that time will thus be unrelated to Subsection (D)").

Mother does address some of the evidence of her pre-removal conduct in this issue. She downplays the evidence of her August 2023 DWI, which she argues "was not relevant and should not have been admitted." But there had been multiple CPS intakes related to Mother's alcohol use around the time of her DWI arrest, and Mother agreed at trial that her drinking had been out of control. Thus, even without the August 2023 DWI evidence, there was sufficient evidence of an endangering environment.

31

Finally, Mother argues, consistent with the rest of her contentions on this issue, that "Father's actions endangered the children, not" hers. But even without considering Mother's own conduct related to her alcohol abuse, the evidence shows that she knowingly placed or knowingly allowed the children to remain with Father; thus, his endangering conduct is relevant to our review of the trial court's Subsection (D) finding. *See J.W.*, 645 S.W.3d at 749 ("The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry.").

Whether we view the evidence in the light most favorable to the judgment or weigh all of the disputed evidence, *see In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018), a reasonable factfinder could form a firm belief or conviction that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being. Thus, the evidence is legally and factually sufficient to support the trial court's endangerment finding under Subsection (D). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D); *In re S.M.*, No. 02-23-00079-CV, 2023 WL 4501821, at *5 (Tex. App.—Fort Worth July 13, 2023, no pet.) (mem. op.) ("Because the record demonstrates that Mother's past conduct subjected the children to a life of uncertainty and instability and because we may infer that similar conduct will recur if the children were returned to Mother, we conclude that legally and factually sufficient evidence supports the endangering-conduct predicate ground."); *cf. In re H.H.*, No. 2-07-345-CV, 2008 WL 2854611, at *5 (Tex. App.—Fort

Worth July 24, 2008, no pet.) (mem. op.) ("The evidence established that [the mother] allowed [one child] to remain in conditions and surroundings that endangered her physical and emotional well-being and that her continuous drug use constituted conduct that endangered both [children's] physical and emotional well-being."). We overrule Mother's first issue. Because only one finding alleged under Section 161.001(b)(1) is necessary to support a termination judgment, we need not address Mother's second issue, in which she challenges the sufficiency of the evidence to support the trial court's predicate finding under Subsection (E). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### D. MOTHER'S THIRD ISSUE: BEST-INTEREST FINDING

In her third issue, Mother challenges the legal and factual sufficiency of the trial court's finding that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *A.C.*, 560 S.W.3d at 631. In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the

33

evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A) the [child's] desires . . . ;

(B) the [child's] emotional and physical needs [at the time of trial] and in the future;

(C) the emotional and physical danger to the child [at the time of trial] and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F) the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I) any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## 1. The Children's Desires

C de Baca testified that as recently as the weekend before trial began, Kelly expressed that she did not want to see Mother anymore. Mother refers to her trial testimony that a representative of the Department had told her that Maci had drawn a picture of her family together and contends, "The fact that the child drew a picture of the family together is telling about her wishes." But none of the children testified at trial, and there was no evidence showing that Maci—who had turned eleven years old during the trial's long recess—or Mandy—who turned five during the same recess— had sufficient maturity to express their desires. This factor therefore weighs in favor of terminating Mother's parental rights to Kelly and neither in favor of nor against terminating Mother's parental rights to Maci and Mandy. *See Z.R.*, 2025 WL 3181160, at \*10 (holding that "this factor weighs neither in favor of nor against the trial court's finding because none of the [c]hildren testified at trial, all of them were under ten at the time of trial, and no evidence showed that they had sufficient maturity to express their desires"); *In re A.P.*, No. 02-22-00180-CV, 2022 WL 16646478, at \*10 (Tex. App.—Fort Worth Nov. 3, 2022, no pet.) (mem. op.) (holding that this factor weighed neither in favor of nor against termination when none of the children testified at trial and "all four of them were under ten at the time of trial and therefore too young to express their desires").

## 2. The Children's Emotional and Physical Needs

Children need permanency and stability. *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). At trial Grelle specifically testified that the children "need[ed] permanency," and C de Baca agreed. Mother conceded that they "need[ed] stability." Mother testified that she was gainfully employed and had sufficient resources to cover the expenses of the children living with her. She also believed that she could arrange work schedules to be around when her children needed her. Harrison testified that Mother knew which schools the children would go to and which bus that they would need to ride.

But Harrison also testified that each child had specialized mental health or emotional needs and that Mother did not discuss those specialized needs. Harrison's testimony also revealed that the home where Mother intended the children to live did not have a bed for every child or enough space for all the children's clothing. By contrast, Grelle testified that the children were all in stable placements and getting their needs met, something that was not happening when they were living with their parents. Further, Mother testified that she believed that the children needed to be protected from Father, but the trial court could have reasonably determined that Mother would not do so. We therefore weigh this factor in favor of the trial court's best-interest finding. *See Z.R.*, 2025 WL 3181160, at *11 (weighing needs factor in favor of termination where "some evidence indicated that [m]other could meet the [c]hildren's emotional and physical needs" but "ample testimony showed that

36

[adoption-motivated placement] could meet all of [their] needs"); *A.P.*, 2022 WL 16646478, at *10 (holding that needs factor weighed in favor of termination where permanency specialist testified that children "required more attention and a keener eye than other children in her caseload"; neither parent was able to provide necessary level of care; and children's then-current placements were able to meet their physical and emotional needs).

### 3. Emotional and Physical Danger to the Children

Grelle testified that the domestic violence that the children had witnessed had endangered them. She also testified that she would have concerns, due "to continued drug use and domestic violence," about the safety of the children if they were returned to their parents. And she testified to how the domestic violence posed both a physical and emotional danger to the children. *Cf. In re G.M.*, No. 02-23-00061-CV, 2023 WL 4243349, at *8 (Tex. App.—Fort Worth June 29, 2023, pet. denied) (mem. op.) (holding that third *Holley* factor supported termination where trial court had heard testimony that eight-year-old child "would want to be protective of his mother and could be physically injured or even killed trying to protect her in a domestic-violence incident").

Mother stresses that she had made changes in regard to her relationship with Father and that she was protecting herself, and therefore the children, by remaining separated from Father. She contends that "[t]here is no evidence, only suspicion, that Mother and Father would continue a romantic relationship in the future." But the

37

trial court expressly found (1) that Mother had "lied about her contact with [Father] throughout the trial"; (2) that she "was unwilling to protect the children and herself from [Father's] drug usage and domestic violence" and to separate from him; and (3) that Mother and Father "intended to remain in a relationship and parent the children together despite the domestic violence and ongoing drug concerns." Based on its credibility finding and the testimony at trial about the nature of Mother and Father's relationship, which could at the very least be characterized as "turbulent and unpredictable," the trial court could have reasonably inferred that Mother's and Father's relationship posed a threat of emotional—and even physical—danger to the couple's children. *See Z.R.*, 2025 WL 3181160, at *11; *In re M. H.*, No. 02-22-00048-CV, 2022 WL 2840266, at *6 (Tex. App.—Fort Worth July 21, 2022, no pet.) (mem. op.) ("Mother's on-again/off-again relationship with [the father of another one of her children] evinced not only an unstable home life but also the emotional and physical danger to [her older child] should she be placed with Mother.").

The future emotional and physical danger to the children if they were returned to Mother was not limited to the threat of domestic violence. According to Harrison's testimony, Mother's home was not safe for the children. As for drug use, Grelle testified that even if Mother was not personally using methamphetamine, the children would still be put in danger just by her being "around it."

Mother testified that she believed that the children had suffered emotional harm in the care of the Department. But she also testified that she understood that

38

Maci was in a very fragile state and that disrupting that state could cause more harm to Maci. And although Grelle testified to the possibility that the children might not ever see their parents again if the parent–child relationships were terminated, removing the children from their current placements risked causing them emotional trauma and upsetting their stability. *See Z.R.*, 2025 WL 3181160, at \*11; *M.J.*, 2023 WL 3643673, at \*11. On balance, this factor supports termination.

### 4. Parental Abilities

The trial court did not have to believe Mother's testimony that she had learned that her use of alcohol was impacting her ability to be a good parent or Father's testimony that Mother had been able to remain sober in the past. And Mother had not demonstrated an ability to provide and maintain safe, stable, and suitable housing for the children. Hutchison testified that during her investigation in 2023, Mother had "said she was not making enough to get stable housing for her and the children." C de Baca testified that he had "no reason to believe that [Mother] would provide . . . an environment different from what [the children] had when they entered the case."

Additionally, the testimony of multiple witnesses who had observed some of Mother's visits with the children raised concerns about Mother's ability to handle Maci's and Mandy's behavioral issues. Mother appeared to have either not learned or not applied what she had learned from her classes and counseling. And although there was sparse evidence of the parental abilities of the children's foster parents, Harrison testified that the children's respective placements were able to meet all their

39

needs. This factor supports termination. *See In re K.A.*, No. 02-22-00442-CV, 2023 WL 2429793, at *6–7 (Tex. App.—Fort Worth Mar. 9, 2023, no pet.) (mem. op.) (holding that needs and abilities factors weighed in favor of termination where "[t]he Department did not express any concerns about the parenting abilities of the children's current foster parents" but "had many concerns about returning the children to Mother," who "had not demonstrated the behaviors that she had learned in her parenting courses, and she had failed to make substantive changes in her life"); *In re R.M.*, No. 02-18-00077-CV, 2018 WL 3468464, at *8 (Tex. App.—Fort Worth July 19, 2018, no pet.) (mem. op.) (holding evidence factually and legally sufficient to support trial court's affirmative best-interest finding in part because trial court was presented with evidence of mother's failure to implement sufficient positive parenting techniques, children's serious behavioral needs, and mother's failure to implement the lessons learned through classes and counseling).

### 5. Programs Available

Mother deserves some credit for completing many of the items in her service plan.[17] But again, the trial court did not find Mother's testimony to be credible, and C de Baca and Grelle testified that Mother either had not learned from her services or was not making the desired behavioral changes based on those services. *See C.W.*,

---

[17]Mother complains in her brief that Grelle "testified that Mother failed to complete her counseling, [but] she did not fail to complete it[;] it is still on going [sic]."

2022 WL 123221, at *9–11 (holding that the programs-available factor slightly favored trial court's best-interest finding where the Department caseworker testified "that Mother would complete services so that she could check the box showing that she had complied, but despite completing the services and checking the box, Mother could not show that she had learned anything."); *In re A.W.*, No. 02-21-00058-CV, 2021 WL 3204955, at *15 (Tex. App.—Fort Worth July 29, 2021, pet. denied) (mem. op.) ("Mother had a home and a job with which to support [her child], and she had 'completed service plan after service plan,' but the trial court could have found that completing the plan was not the same as learning from the plan and breaking a lifetime's worth of habits."). The trial court was also entitled to take into account the families lengthy history with the Department, including the fact that they did not change their behaviors after having twice before received FBSS assistance.

At the time of trial, Maci was seeing a psychiatrist, and Kelly was also in counseling. Both girls were also receiving educational services for their special needs. According to C de Baca's testimony, Mandy had received all her necessary services, including play therapy, in a timely fashion since her placement. Mother said she understood that the children had been in therapy since the case began and that they had benefited from that therapy. Mother testified at trial that she would "make sure that [Maci would] still continue to go to all [the] services that she need[ed] to do to make sure that she [could] get better," but Mother had not even contacted a provider for Maci. This factor favors termination. *See C.W.*, 2022 WL 123221, at *10

41

("Mother was aware that the children were undergoing counseling because both were prone to violence, and she asserted that if they were placed with her, she would continue the children's counseling and manage their medications. . . . Even with programs available to help Mother and the children, Mother's willingness to access the programs and ability to follow through with them appeared questionable.").

### 6. Plans for the Children

At the time of trial, the children were all in adoption-motivated placements. OCOK's plan was for the children to be adopted. However, as of the last day of trial, OCOK did not have a plan for all three children to be adopted by the same placement. Mother's plan, on the other hand, was for the children to live together with her. But Mother had failed to demonstrate that she could provide the children with a safe, stable living environment. And C de Baca testified that there was "a high non-zero chance that [the children] could be reunited."

Generally, it is in a child's best interest to keep siblings together whenever possible. *A.O.*, 2022 WL 1257384, at *14. But under the Texas Family Code, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a).

Ultimately, this factor weighs in favor of termination. *See Z.R.*, 2025 WL 3181160, at *12 ("The trial court was entitled to believe the testimony that the [c]hildren's respective placements at the time of trial were adoption-motivated and to be skeptical that Mother could provide the [c]hildren with a safe, stable environment,

42

because of her past willingness to let others take primary responsibility for the [c]hildren and the doubts expressed that she could care for all the [c]hildren."); *In re P.W.*, No. 02-24-00211-CV, 2024 WL 4293564, at *12 (Tex. App.—Fort Worth Sept. 26, 2024, no pet.) (mem. op.) (concluding that plans factor favored termination, where parents had difficulty articulating their future plans for child and foster parents were adoption-motivated); *G.M.*, 2023 WL 4243349, at *9 (stating that this factor weighed "slightly in favor of termination" where "Mother's plan was less well-defined than the Department's").

### 7. Stability of the Home/Proposed Placement

Here again, the instability in Mother's home life weighs against her and in favor of the trial court's best-interest finding. "Stability and permanence are paramount in the upbringing of children." *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). The evidence of the stability of the permanent placements of the children in their current placements was uncontroverted. *See Z.R.*, No. 02-25-00268-CV, 2025 WL 3181160, at *13. We have recognized that a parent who is "[u]nstable herself" cannot offer her children stability. *See A.P.*, 2022 WL 16646478, at *11 (quoting *In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *19 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g)). This factor weighs in favor of termination.

43

## 8. Mother's Acts or Omissions

Although Mother visited the children, and they were described as bonded with her, C de Baca's and Grelle's testimony about what they had observed during the visits indicated that Mother's parent–child relationships with the children were not proper. Mother acknowledged having had an "altercation" with Kelly in August 2023. Grelle testified that Mother had locked Kelly outside the home, and C de Baca testified that Kelly had expressed to him that she did not even want to see Mother. Mother also admitted that she and Father had violated the FBSS safety plan by being together around the children unsupervised. They were alone with the children in December 2023 when they got into the fight that led to Father's being arrested for continuous family violence. Father testified that Mother had lied to the children about him.

The trial court also heard extensive testimony about Mother's alcohol abuse. Father testified that there had been multiple situations where Mother's drinking had put the children in danger. Grelle testified that in August 2023 "there was a concern for the parents being drunk and driving with the children" and "a report that [Maci] had asked to live with a friend because she wanted a normal family." Even though Father also testified that he believed that Mother had become "a better person" and that "her eyes ha[d] literally opened up," the trial court found Father not credible and was not required to rely on his testimony as evidence that Mother had made a lasting change. *See In re K.A.S.*, 131 S.W.3d 215, 229–30 (Tex. App.—Fort Worth 2004, pet.

44

denied) ("A trial court can measure the future conduct of parents by their recent past conduct[] but is not required to believe that there has been a lasting change in a parent's attitude since h[er] children were taken."). This factor weighs in favor of termination. *See Z.R.*, 2025 WL 3181160, at *13 (determining that eighth *Holley* factor weighed in favor of terminating mother's parent–child relationships in part because mother's drug use around and impacting children, coupled with her inability to consistently stay sober, evidenced an improper parent–child relationship).

### 9. No Excuses for Mother's Conduct

Mother offered little in the way of excuses for her troubling acts and omissions. *Cf. G.M.*, 2023 WL 4243349, at *10 ("The record contains little as far as excuses for [m]other's acts and omissions. . . . This factor supports termination."). Rather, she denied many of the allegations and minimized the domestic violence in her relationship with Father.

The trial court was not compelled to believe Mother's self-serving denials. *See K.A.*, 2023 WL 2429793, at *8 ("Despite [m]other's numerous denials, a factfinder is not compelled to believe testimony that comes from a biased or an interested source."). We conclude that this factor supports termination.

### 10. Evidence Supporting Best-Interest Finding Sufficient

In sum, although some of the *Holley* factors weigh less heavily in favor of termination than others, not one of the nine factors weighs against the trial court's best-interest finding. Viewing the evidence in the light most favorable to the trial

45

court's best-interest finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266. Further, based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Thus, under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding by clear and convincing evidence that termination of the parent–child relationships between Mother and the children is in the children's best interest. *See J.G.*, 2020 WL 3410503, at *10. We overrule Mother's third issue.

### E. MOTHER'S FOURTH ISSUE: DUE PROCESS

In her fourth issue, Mother argues that the trial court denied her due process by not requiring that trial be continued until the Department was able to subpoena Jennifer. But Mother did not request a continuance when Jennifer failed to appear on the final day of trial. Instead, Mother made the following objection:

> Well, I mean, I can ask that -- to -- to give me a running objection to anybody testifying about anything that she put in the file.
>
> . . . .
>
> . . . And that means -- and that means the witness that they have from the Department who has no personal knowledge about what happened can't testify about what she knows because it was provided by somebody in the office.

46

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, then error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

Although Mother objected at various points on Confrontation Clause and personal-knowledge grounds, she did not raise her due-process argument in the trial court. Complaints about due-process violations must be raised and ruled on in the trial court to be preserved for appeal. *In re J.P.-L.*, 592 S.W.3d 559, 575 (Tex. App.—Fort Worth 2019, pet. denied). Therefore, because Mother did not raise her due-process-violation claim in the trial court, she has failed to preserve it for our review. *See id.*; *see also In re N.Y.*, No. 02-24-00065-CV, 2024 WL 2347639, at *2 (Tex. App.—Fort Worth May 23, 2024, no pet.) (mem. op.). We overrule Mother's fourth issue.

## IV. CONCLUSION

Having overruled Mother's first, third, and fourth issues, and not needing to address her second issue, we affirm the trial court's judgment terminating Mother's parent–child relationships with the children. Having determined that no arguable grounds for appeal can be raised on Father's behalf, we affirm the trial court's judgment terminating Father's parent–child relationships with the children. Father's counsel remains appointed in this case through any proceedings in the Texas Supreme

47

Court unless otherwise relieved of these duties.  *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (order).

/s/ Brian Walker

Brian Walker
Justice

Delivered:  February 19, 2026